DIANE SPERLING, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Rush-Presbyterian-St. Luke's Hospital, Appellee).

First District (Industrial Commission Division)   No. 1—87—1447WC

Opinion filed May 25, 1988.—Rehearing denied July 12, 1988.

McCULLOUGH and McNAMARA, JJ., dissenting.

George J. Cullen & Associates, Ltd., of Chicago (Charles G. Haskins, Jr., of counsel), for appellant.

Kane, Doy & Harrington, Ltd., of Chicago (Robert E. Harrington, of counsel), for appellee.

JUSTICE CALVO delivered the opinion of the court:

Claimant, Diane Sperling, filed an application for adjustment of claim under the Worker's Occupational Diseases Act (Ill. Rev. Stat. 1977, ch. 48, par. 172.36 *et seq.*), alleging that she contracted hepatitis out of and during the course of her employment with Rush Presbyterian-St. Luke's Hospital. The Industrial Commission affirmed the arbitrator's finding that claimant did not establish a causal connection between her employment and her disease. The circuit court confirmed. Claimant appeals, alleging (1) that the Industrial Commission's determination that a causal connection was not established is contrary to the manifest weight of the evidence; and (2) alternatively, that the Industrial Commission considered inadmissible evidence in making its determination. The facts are as follows.

Claimant currently suffers from chronic persistent hepatitis B, a viral infection of the liver which is contracted exclusively through intimate physical contact with the body secretions of an infected person, the usual mode of transmission being through blood contact. There is presently no known cure for this condition. The following evidence was admitted regarding this condition and the likelihood that it is causally connected to claimant's employment.

In January 1978, claimant was hired by the employer as an operating room nurse. Prior to this time, she had worked as an operating room nurse at another hospital for five years. Operating room nurses may be divided into two subcategories: scrub nurses and circulating nurses. Scrub nurses assist surgeons in the operating room; circulating nurses assist the medical personnel performing an operation from outside the perimeter of the operation procedure. Both jobs require the handling of sharp medical instruments which have been exposed to patient blood. Claimant testified that approximately once per week she pricked herself through the skin with these instruments. A written statement from claimant's nursing supervisor stated that claimant easily could have punctured herself or had small cuts on her hands while exposed to infected blood. Near the end of September 1978 claimant began feeling uncharacteristically fatigued, prompting her to seek medical attention.

On October 4, 1978, claimant was examined by Dr. Michael Ramsey, a physician specializing in internal medicine. Dr. Ramsey testified that claimant complained of fever, headaches and fatigue of approximately two weeks' duration. A physical examination revealed no abnormalities except red inflamed tonsils and yellowish eyes. Since yellowish eyes suggest the possibility of liver disease, Dr. Ramsey had a full battery of chemical tests performed to exclude hepatitis. The liver enzyme tests showed evidence of hepatitis. Dr. Ramsey then referred claimant to Dr. John Payne, a liver disease specialist, who confirmed Dr. Ramsey's diagnosis. A liver biopsy performed in January 1979 confirmed that claimant was suffering from chronic persistent hepatitis B. According to Dr. Payne, this condition increases the likelihood that claimant will develop liver cancer.

Dr. Ramsey testified to a reasonable degree of medical certainty that claimant's condition was caused by work-related factors. He based his opinion on "hundreds of articles, textbooks, [and] journal articles that show that people in the health care field, doctors and other medical personnel, specifically operating technicians, dialysis workers, [and] emergency workers, have a greatly increased incidence of hepatitis B, due to exposure to patients and the patients' tissues

and body fluids." Although claimant related that she had recently traveled to Aruba, Mexico, and the Caribbean, and that a parrot had bitten her in Mexico, Dr. Ramsey did not believe that claimant contracted her hepatitis through contact with contaminated water or food, or the parrot bite, because hepatitis B is contracted exclusively through intimate physical contact with human body fluids. In this regard, claimant testified that she has never been an intravenous drug user and that her husband during this period did not contract the disease.

Dr. Payne testified that the incubation period of hepatitis B varies according to the mode of exposure and how one defines the onset of the disease. He stated that while the usual incubation period was seven to eight weeks, the period could be as little as seven days or as long as six months. However, the incubation period apparently does not coincide with the onset of symptoms because both Dr. Payne and Dr. Ramsey recognized that active carriers of the disease can be totally asymptomatic. Dr. Payne noted that since claimant had not had hepatitis symptoms between her 1975 blood donation (screening for the hepatitis B virus antigen in blood donations became widespread around 1974-75) and the time she was first diagnosed with the hepatitis B virus, it was difficult to pinpoint a precise time between 1975 and 1978 when she became infected. There is no evidence that such screening was in fact performed on claimant's blood donation.

In Dr. Payne's opinion, the inference is strong that claimant contracted hepatitis B from her employment because studies had shown that 20% of all operating room nurses had a past or current infection. However, he stated that he could not render an opinion that her employment was a probable cause of the disease because the statistical studies in existence relied upon exposures which would have occurred prior to when widespread screening for hepatitis B was put into effect (i.e., 1974-75). Furthermore, Dr. Payne believed that the incidence of infection among operating room nurses would be a great deal less than the 10%-per-decade incidence recorded among surgeons. Although Dr. Payne was not aware of any studies, he estimated that the incidence for operating room nurses would be somewhere in the range of 3% to 5% per decade. Dr. Payne testified that the carrier rate of the general United States population (i.e., those with contagious hepatitis B) is approximately .5%; however, persons with an oriental background have a carrier rate of about 20%.

■ Although an occupational disease need not be foreseeable or expected, it must appear to have had its origin or aggravation in a risk connected with the employment and to have flowed from that

source as a rational consequence. (Ill. Rev. Stat. 1977, ch. 48, par. 172.36.) Because we are unaware of any Illinois case which specifically addresses the type of proof a health care worker must present to establish hepatitis as an occupational disease, we look to case law in foreign jurisdictions for guidance.

In *Sacred Heart Medical Center v. Department of Labor & Industries* (1979), 92 Wash. 2d 631, 600 P.2d 1015, an intensive care unit nurse who contracted hepatitis filed an industrial insurance claim alleging that her hepatitis was a compensable occupational disease. Relying upon the claimant's testimony that she had broken skin and cuts when she came into physical contact with human body secretions, claimant's testimony that she was neither sexually promiscuous nor an intravenous drug user, medical testimony that carriers of the disease may be undetectable, and medical testimony that she was more likely to contract hepatitis than a member of the general public, the finder of fact determined that claimant's hepatitis "[arose] naturally and proximately out of *** employment" (92 Wash. at 632, 600 P.2d at 1016; Wash. Rev. Code §51.08.140 (1962)) and awarded benefits. The appeals court reversed the fact finder, stating that claimant's hepatitis was not compensable because she did not establish a causal link between her employment and the disease; specifically, that claimant had neither identified a specific exposure incident nor, for that matter, established that the hospital handled active cases of hepatitis while claimant was employed. See *Sacred Heart Medical Center v. Carrado* (1978), 20 Wash. App. 285, 579 P.2d 412.

The supreme court of Washington reversed the appeals court and reinstated the compensation award. In doing so, the court set forth the following general principle: "If, from the medical testimony given and the facts and circumstances proven by other evidence, a reasonable person can infer that the causal connection exists, we know of no principle which would forbid the drawing of that inference." (92 Wash. 2d at 636-37, 600 P.2d at 1019.) Applying this principle to the facts, the court concluded:

"Here the medical testimony showed that there is generally a greater probability that a person in the petitioner's employment will contract hepatitis than there is that someone in another employment will do so. In other words, there is a greater risk of getting the disease when one is employed in a hospital. The Board and the jury were entitled to consider this evidence in conjunction with the petitioner's uncontradicted and undiscredited testimony that none of her other activities involved such exposure, and to reach the conclusion that, more likely

than not, the disease resulted from contact with a carrier in the hospital." (92 Wash. 2d at 637, 600 P.2d at 1019.)

Regarding the lack of evidence that claimant came into direct contact with a hepatitis carrier, the court noted:

> "[T]he Court of Appeals quite evidently overlooked the testimony that a carrier of the disease may be undetectable as such. If the petitioner contracted the disease from such a person, the person who had the disease and manifested the symptoms would be entirely irrelevant. While such proof might afford room to infer that there was an increased opportunity to contract the disease, the medical testimony which was presented was sufficient to support an inference that the petitioner did come in contact with a carrier at the hospital, even though that carrier was not recognizable as such." 92 Wash. 2d at 636, 600 P.2d at 1018.

Although our courts have traditionally required direct proof that the claimant has in fact been exposed to a disease while employed (see *County of Cook v. Industrial Comm'n* (1973), 54 Ill. 2d 79, 275 N.E.2d 465; *Lewis v. Industrial Comm'n* (1967), 38 Ill. 2d 461, 231 N.E.2d 593; *Byrd v. Industrial Comm'n* (1965), 33 Ill. 2d 115, 210 N.E.2d 535; *City of Chicago v. Industrial Comm'n* (1949), 403 Ill. 105, 85 N.E.2d 665), we observe that the direct proof approach is too rigid for rote application because it fails to take into account situations where a health care worker could be exposed to an undetected disease carrier through an employment-related risk. Stated differently, it is illogical to require the establishment of a direct causal link when there is a *prima facie* showing that the disease easily could have been contracted by the health care worker during employment from an undetected source. We further note that the instant claimant could not possibly determine the precise exposure episode which caused her disease because she may not have developed symptoms until long after the incubation period.

As is revealed in Larson's The Law of Workmen's Compensation (1 A. Larson, The Law of Workmen's Compensation §8.50 (1985)), a number of other jurisdictions have allowed recoveries where the evidence showed that the claimant's working environment involved an increased risk of contraction of a disease. In *Roe v. Boise Grocery Co.* (1933), 53 Idaho 82, 21 P.2d 910, compensation was awarded for the death from Rocky Mountain spotted fever of a salesman whose duties required frequent trips through territory infected with wood ticks, although there was also evidence of two personal trips into that territory. The California Appellate Court allowed recovery for the death of

an employee who had been sent to Peru during a typhoid epidemic to which foreigners would be peculiarly susceptible and had contracted the disease. (*Fidelity & Casualty Co. v. Industrial Accident Comm'n* (1927), 84 Cal. App. 506, 258 P. 698.) And, in *Lothrop v. Hamilton Wright Organizations, Inc.* (1974), 45 A.D.2d 784, 356 N.Y.S.2d 730, an employee sent into Bolivia to take photographs, who contracted infectious viral hepatitis upon his return, was held to have contracted the disease as a result of his exposure to deplorable sanitary conditions. Even though the etiology of polio was obscure, a nurse who worked in a polio ward and became ill with the disease was allowed to recover upon a showing that the incidence of the disease is higher among nurses and others constantly in contact with the disease. *Industrial Comm'n v. Corwin Hospital* (1952), 126 Colo. 358, 250 P.2d 135.

■ After analyzing the applicable legal principles, we conclude that the ultimate issue of a health care worker's exposure to an occupational disease may be inferred from indirect proof when it is established that direct proof may be irrelevant. Since the Commission based its instant factual determination on the assumption that claimant had to present direct proof that she was exposed to hospital patients with hepatitis B, we must reexamine the evidence to see if the indirect proof approach is applicable and, if so, whether the Commission's decision can be supported when the evidence is viewed under the indirect proof approach.

■ In the present case, it was established that hepatitis B is contracted solely through intimate physical contact with human body secretions. Moreover, Drs. Payne and Ramsey acknowledged that active carriers of hepatitis B can be totally asymptomatic. Although "widespread" screening for the hepatitis B virus has begun, the only evidence presented which touches on the scope of this "widespread" screening is that blood donations are routinely screened to prevent contamination of the blood supply. No evidence was presented that the hospital patients claimant came into contact with had been routinely screened for the hepatitis B virus antigen nor was any evidence presented that claimant's 1975 blood donation was screened for the virus. Since it is also undisputed that claimant's employment brought her into frequent contact with sharp surgical instruments and other items sullied by human blood, and that she often had cuts or punctures through her skin while handling these items, claimant established that she could have been exposed to an undetected hepatitis B carrier through an employment-related risk. Indirect proof may therefore be used to establish the causal link. Under the indirect proof ap-

proach, claimant is entitled to compensation if it is more likely than not that the disease resulted from contact with a carrier in the hospital. See 92 Wash. 2d at 637, 600 P.2d at 1019.

■ The undisputed medical testimony indicates that claimant's employment as an operating room nurse exposed her to the hepatitis B virus to a greater degree than the general public. Furthermore, claimant's uncontradicted and undiscredited testimony indicates that she did not contract the disease through any type of sexual activity or intravenous drug use. While we imagine it is possible that claimant contracted the disease from nonemployment-related activities, this possibility is remote because hepatitis B is contracted exclusively from intimate physical contact with human body secretions, the usual mode of transmission being the one to which claimant was frequently exposed during her employment (*i.e.*, blood contact). After reviewing all the evidence, we conclude that the only permissible inference which may be drawn is that claimant's hepatitis B was more likely than not contracted through her employment as an operating room nurse. The Commission's determination that claimant had failed to establish a causal connection between her employment and the disease is therefore contrary to the manifest weight of the evidence. Our decision on the issue of causation makes a determination of the evidentiary issue unnecessary.

For the foregoing reasons, the judgment of the circuit court confirming the Commission's denial of compensation is reversed, with the cause remanded to the Commission for the award of appropriate compensation.

Reversed and remanded.

BARRY, P.J., and WOODWARD, J., concur.

JUSTICE McCULLOUGH, dissenting:
The arbitrator, the Industrial Commission, and the circuit court of Cook County found that there was no causal connection between the employee's contracting hepatitis and her employment.

Dr. Payne, the chief of liver diseases at Rush Presbyterian-St. Luke's Hospital testified that dentists, pathologists, and surgeons who are actively involved in patient care acquire hepatitis B infection at the rate of 10% per decade of practice. He knew of no data as to nurses in the position of the employee in this case but indicated that the risk of the doctors would be greater than that of a scrub nurse or a circulating nurse who is exposed once a week. He further testified:

"[T]hat the likelihood of her acquiring the infection during this three-year period, without a specific instance of acute hepatitis to give us clues as to when it happened and to narrow down exactly when it took place, weakens the case that it occurred in the operating room, since it is clearly transmitted through sexual contact, throughout types of intimate contact. We really have to know much more about her history throughout this time, and also the serology, the hepatitis B status of intimate contact over this period of time to make any strong conclusions."

He was also specifically asked whether he had a medical opinion to think that it was more probable than not that it might or could be related to her employment and his answer was "I don't know."

It is clear that there was sufficient testimony presented to the Industrial Commission that its decision is not against the manifest weight of the evidence. The mere possibility that a person may have become infected with a disease in the course of her employment is not sufficient to warrant an award of compensation. *Cook County v. Industrial Comm'n* (1973), 54 Ill. 2d 79, 275 N.E.2d 465.

As stated by the trial court in affirming the Industrial Commission decision:

"There being no evidence of actual exposure in the work place, no record of medical history of prick wounds to support Petitioner's self serving testimony, and conflicting medical opinion of causation the Commission's finding of failure to prove a compensatable [*sic*] occupational disease is not against the manifest weight of the evidence nor a contrary to the law."

To say that the risk or potential to get hepatitis is sufficient regardless of any direct link will open the floodgates to recovery. If there is no need to establish a direct link between the work and the disease then a worker would never need to establish how the disease was contracted. The majority in effect sets forth an irrefutable presumption as to health care workers. In this case, the employee simply made no showing that the disease arose out of her employment.

As stated above, there was more than sufficient evidence before the Commission to find as it did and the trial court and the Industrial Commission should be affirmed.

McNAMARA, J., joins in this dissent.